# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 CR 585 | **DATE** | 10/22/2001 |
| **CASE TITLE** | USA vs. Jerome P. Genova, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. This Court hereby enters a judgment of guilty against defendant Lawrence P. Gulotta on Counts One, Two, Three, Four, Five and Six of the pending indictment. Cause referred to the Probation Dept. for a Presentence Investigation. Sentencing set for January 29, 2002 at 1:00 p.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| ✓ | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

number of notices

date docketed

date mailed notice

RO courtroom deputy's initials

ED-7 FILED FOR DOCKETING
01 OCT 22 PH 4: 39

Date/time received in central Clerk's Office

mailing deputy initials

**Document Number**

154

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 00 CR 585 |
| | ) | |
| JEROME P. GENOVA, | ) | Judge Ruben Castillo |
| LAWRENCE P. GULOTTA, and | ) | |
| JEROME J. STACK, | ) | |
| | ) | |
| Defendants. | ) | |

DOCKETED
OCT 2 3 2001

## MEMORANDUM OPINION AND ORDER

It is the Court's hope that all attorneys who read this opinion will be reminded that the practice of law is a public trust to be sacredly guarded and not a right given to any person. As detailed herein, this criminal trial involves two lawyers who stand convicted of serious criminal charges as well as a third lawyer who the Court concludes committed the crime of perjury. The Court strongly believes these men have dishonored the legal profession and should be disbarred.

The defendant Lawrence P. Gulotta ("Gulotta"), with the consent of the United States, voluntarily waived his right to a jury trial. A consolidated trial, with Gulotta's two co-defendants Jerome P. Genova ("Genova") and Jerome J. Stack ("Stack") proceeding before a jury, was held from July 29, 2001 to August 21, 2001. The Court, having reviewed all the evidence, its trial notes and the testimony of the witnesses to determine the credibility of each witness, hereby enters the following findings of fact and conclusions of law pursuant to Federal Rule of Criminal Procedure 23(c).

154

## BACKGROUND

### I. The Indictment

#### A. The RICO Count - Count One

Count One of the indictment charged that Genova, Gulotta and Stack knowingly conducted and participated in the conduct of the affairs of Calumet City, Illinois ("Calumet City"), through a pattern of racketeering activity. The vast majority of the racketeering acts charged in Count One constitute two broad schemes that involved the conduct of Genova following his election to the position of Mayor of Calumet City in 1993: (1) an attorney fees kickback scheme with his City Prosecutor (Racketeering Acts One through Four); and (2) his scheme to misappropriate Calumet City funds with his Commissioner of Public Works, Stack, primarily through the misuse of Calumet City Municipal employees (Racketeering Acts Five through Nineteen).

This opinion's primary focus is those portions of the indictment that related to the attorney fees kickback scheme between Genova and Gulotta. In relevant part, the indictment alleged that beginning in approximately December 1993 and continuing until at least February 1, 2000, the defendants used Calumet City as an enterprise to conduct a pattern of racketeering activity, in violation of Title 18, United States Code, Sections 1961(1) and 1961(5), which included the following:

(a) failing to report and disclose, as required by law, more than $125,000 in payments to Genova from Gulotta and his private law firm, Gulotta & Kawanna, formerly named Antonietti & Gulotta (the "Law Firm"), which both had received more than $418,000 in legal fees from Calumet City during the time of the payments to Genova;

2

(b) causing the payment of more than $125,000 to Genova from Gulotta and the Law Firm, for legal services purportedly rendered by Genova, knowing that Genova did not actually perform the substantial part of this legal work; and

(c) retaining Genova in the capacity of an associate of, and consultant to, Gulotta and the Law Firm, in order to provide Genova with more than $125,000 in payments which were intended, at least in part, to pay back Genova for exercising the power of his office to cause Calumet City to award legal work to Gulotta and the Law Firm. (Indictment, ¶ 5.)

The relevant pattern of racketeering activity alleged for purposes of this opinion was set forth in Racketeering Acts One through Four, which detailed the attorney fees kickback scheme. (*Id.*, ¶ 6.) The indictment alleged that after Genova was elected the Mayor of Calumet City in 1993 he appointed Gulotta to the position of City Prosecutor and caused Calumet City to hire and contract the Law Firm. (*Id.*, ¶¶ 1(k), 7.) This kickback scheme was devised to both defraud the people of Calumet City of their intangible right to the honest services of Genova and Gulotta and to obtain money and property from the people of Calumet City by means of material false and fraudulent pretenses and representations which included: (1) false assertions that $125,000 paid to Genova between early 1994 and 1997 was compensation for legal work, when in actuality Genova did not have to perform a substantial part of this purported legal work, (*id.*, ¶¶ 9, 10); and (2) Genova's failure to disclose any of the payments he received from Gulotta and the Law Firm on the Statement of Economic Interest forms he filed with the Cook County Clerk in 1995, 1996, 1997 and 1998, or to the City Council of Calumet City (the "City Council") prior to, during or after its deliberations to pay legal fees to Gulotta and the Law Firm and to reappoint him as its City Prosecutor. (*Id.*, ¶¶ 11-13.)

Racketeering Act One specifically alleged that even though Gulotta and the Law Firm provided Genova with approximately $19,451 in payments, that on or about March 23, 1995, Genova and Gulotta committed mail fraud, in violation of Title 18, United States Code, Sections 1341 and 1346, in that for purposes of executing the alleged attorney fees kickback scheme they knowingly caused a letter to be delivered to the Cook County Clerk, a Statement of Economic Interest, that falsely declared that Genova had not served in any advisory capacity for any professional organization from which he received in excess of $1,200. (*Id.*, ¶ 17(a).) Racketeering Act One also alleges a violation of the Illinois Official Misconduct laws, 720 ILCS 5/33-3(c) and 720 ILCS 5/5-1, in that Genova and Gulotta obtained money and property from the people of Calumet City through the performance of official acts by Genova as Mayor in excess of his lawful authority, by:

(1) filing a Statement of Economic Interest signed by Genova, falsely declaring that he had not served in any advisory capacity for any professional organization from which he had received in excess of $1,200 during the preceding calendar year, and that he had not rendered professional services to the Law Firm from which he had received fees in excess of $5,000 during the preceding calendar year, in violation of 5 ILCS 420/4A-101 and 107;

(2) taking and maintaining a direct and indirect interest, in his own name, in contracts and the performance of work in the making or letting of which Genova was called upon to act, that is, legal work provided by Gulotta and the Law Firm on behalf of Calumet City, in violation of 50 ILCS 105/3;

(3) taking and maintaining a direct and indirect interest in contract, work and business of Calumet City, that is, legal work provided by Gulotta and the Law Firm on behalf of

4

Calumet City, when the expense, price and consideration of the contract, work or business was paid from the treasury, in violation of 50 ILCS 105/3; and,

(4) taking and receiving, directly and indirectly, money from Gulotta and the Law Firm as a bribe and means of influencing his action in his official character, in violation of the Calumet City Municipal Code, § 2-22; (*Id.*, ¶ 17(b).)

Racketeering Act One alleged that the illicit relationship between Genova and Gulotta constituted bribery in violation of Illinois law in two distinct fashions. The behavior alleged violated 720 ILCS 5/33-1(d) because Genova received, retrieved and agreed to accept payments from Gulotta and the Law Firm, which he was not authorized by law to accept, knowing that the property was promised and tendered with intent to influence his performance of acts related to his employment as Mayor, including his ability to cause Calumet City to contract with Gulotta and the Law Firm to provide legal services to Calumet City. Finally, the indictment alleged that the illicit relationship also constituted bribery by Gulotta, in violation of 720 ILCS 5/33-1(a), in that he promised and tendered property, namely payments of money, to Genova, which he was not authorized to accept, with the intent to influence the performance of acts related to his employment as Mayor, including his ability to cause Calumet City to contract with Gulotta and the Law Firm to provide legal services to Calumet City.

Racketeering Act Two alleged the same mail fraud, Illinois official misconduct and bribery charges for the 1995 Gulotta payments of approximately $62,775 to Genova. Racketeering Acts Three and Four similarly alleged the same violations for the respective 1996 Gulotta payments of $38,775 and the 1997 Gulotta payments of $5,150 to Genova.

## B. The Mail Fraud Counts - Counts Two, Three & Four

Count Two of the indictment alleged the crime of mail fraud because Genova and Gulotta's attorney fees kickback scheme defrauded the people of Calumet City of their intangible right to the honest services of Genova and was used to obtain money and property from the people of Calumet City.

The specific mailing alleged was the April 1, 1996 Statement of Economic Interest signed by Genova and mailed to the Cook County Clerk. (*Id.*, Count Two.) Count Two was the same mail fraud charged, in part, in Racketeering Act Two. (*Id.*, ¶19(a).) Count Two, as well as all the other mail fraud counts, also specifically charged a violation of the aiding and abetting statute which was most applicable to Gulotta's role in the offense. Count Three similarly alleged a mail fraud violation by Genova and Gulotta which related to the March 18, 1997 Statement of Economic Interest signed by Genova and mailed to the Cook County Clerk. (*Id.*, ¶ 21(a).) Count Four of the indictment also charged a similar mail fraud charge related to the March 26, 1998 Statement of Economic Interest signed by Genova and mailed to the Cook County Clerk. (*Id.*, Count Four.) This was the same mail fraud violation charged, in part, by Racketeering Act Four. (*Id.*, ¶ 23(a).)

## C. The Theft of Government Property Counts - Counts Five & Six

Counts Five and Six of the indictment charged all three defendants, Genova, Gulotta and Stack, with stealing, and obtaining by fraud, and knowingly converting funds belonging to Calumet City having a value of at least $5,000 while serving as agents of Calumet City, which received benefits in excess of $10,000 through federal assistance in the respective years of 1996 and 1997. (*Id.*, Counts Five and Six.)

6

## II. The Jury's Verdict

On August 27, 2001, at the conclusion of a three week trial, the jury returned a verdict finding Genova and Stack guilty of certain of the charges contained in the indictment. Stack was convicted of racketeering, as charged in Count One, as well as the two theft of funds charges alleged in Counts Five and Six.

Genova was also convicted of Counts Five and Six as well as the racketeering charge contained in Count One. In particular, the jury's itemized verdict found that Genova had committed the following racketeering acts: 1(a) (mail fraud - 1994 attorney fees); 1(b) (official misconduct - 1994 attorney fees); 1(b)(1) (statement of economic interest); 1(c) (bribery (d) - 1994 attorney fees); 2(c) (bribery (d) - 1995 attorney fees); 3(b) (official misconduct - 1996 attorney fees); 3(b)(1) (statement of economic interest); 3(c) (bribery (d) - 1996 attorney fees); 4(a) (mail fraud - 1997 attorney fees); 4(b) (official misconduct - 1997 attorney fees); 4(b)(1) (statement of economic interest); 4(c) (bribery (d) - 1997 attorney fees). Thus, the jury found that Genova's receipt of attorney's fees in each of the charged years violated Illinois Official Misconduct, Bribery and Federal Mail Fraud laws.

With respect to the separate mail fraud charges, defendant Genova was convicted of Count Four, which related to his March 26, 1998 Statement of Economic Interest, but acquitted of Counts Two and Three, which related to his prior two Statements of Economic Interest for the respective years 1996 and 1997.

Finally, the jury also convicted Genova of Racketeering Act 18(a) which charged the state crime of intimidation.

## FINDINGS OF FACT BY THE COURT

The Court concludes that the Government has established by both direct and circumstantial evidence, as well as reasonable inferences therefrom, the following facts beyond a reasonable doubt:

1. Calumet City was a unit of local government known as a municipal corporation and a political subdivision of the State of Illinois. Calumet City provided city services to its citizens. These services were provided by various departments and offices in the executive branch of Calumet City.

2. The executive branch of Calumet City was headed by the office of the Mayor. The Mayor was elected to a four-year term of office and received an annual salary from the City in exchange for his honest services in the discharge of his public duties. Before taking office, the Mayor was required to take and subscribe to an oath that he would support the Constitution of the United States and the Constitution of the State of Illinois, and that he would faithfully discharge the duties of the office of the Mayor of the City of Calumet City according to the best of his ability.

3. The duties and responsibilities of the Mayor included presiding over meetings of the City Council, which was a legislative body consisting of seven elected Aldermen. The duties and responsibilities of the Mayor also included supervision of all the executive officers and employees of the various executive departments and offices of Calumet City. The Mayor appointed the Commissioners, Superintendents and Officers to head these various executive departments and offices, with the advice and consent of the City Council, and had the ability to cause the hiring of other employees of these executive departments and offices.

4. The City Prosecutor was an executive officer of Calumet City. The responsibilities of the City Prosecutor included prosecuting all city charges before the circuit court and all public boards, commissions and bodies. The City Prosecutor was paid compensation for the performance of his duties as approved by the City Council.

5. Calumet City contracted with private attorneys and law firms to provide legal services to the City. The Mayor caused the City to enter into contracts with these private attorneys and law firms. Pursuant to the Municipal Code, all compensation and legal fees paid to private attorneys and law firms providing legal services to the City were submitted to the City Council for approval prior to payment.

6. At all relevant times, Genova and Gulotta were licensed attorneys in the State of Illinois.

7. Genova was elected to serve as the Mayor of Calumet City on April 23, 1993, and was re-elected in April 1997. In April 1998, Genova ran in the Illinois Democratic primary for the office of Illinois State Treasurer.

8. Gulotta was appointed by Genova to serve as the City Prosecutor in December 1993, and was reappointed each year thereafter. (Gov't Ex., City Council Minutes.)

9. The appointment of Gulotta was unusual in several respects. First, Gulotta had not supported Genova's 1993 mayoral candidacy. In fact, Gulotta had instead served as the campaign manager for Genova's mayoral opponent Greg Skubisz, an attorney who previously was associated with Gulotta and the Law Firm. (8/10/01 Tr. at 57-63.) Despite this fact, within six months of his election, Genova chose Gulotta to serve as City Prosecutor even though there was an absence of any prior relationship between Genova and Gulotta.

9

10.   In order to appoint Gulotta as City Prosecutor, Genova terminated the pre-existing City Prosecutor, Burt Odelson, who Genova had just appointed on May 1, 1993 shortly after his election.  Genova relieved Mr. Odelson as City Prosecutor effective December 31, 1993, and the City Council ratified that decision at its December 20, 1993 meeting.  (Stipulation No. 1; Gov't Ex., City Council Minutes.)  Several Government witnesses, including the City Clerk and Mr. Odelson, testified that this type of mid-year change of City Prosecutors had never been done before.  One Calumet City Council member voted against this change because he didn't "feel right about it."  (Gov't Ex., City Council Minutes.)  During the December 20, 1993 City Council meeting, the City Council also approved Gulotta's nomination to be City Prosecutor.  (*Id.*)

11.   Genova appointed Gulotta, in part, on the recommendation of Dominick Gigliotti, the Seventh Ward Alderman of Calumet City.  (*Id.*)  Yet, just like virtually everyone else in Calumet City, between January 1994 and January 1997, Alderman Gigliotti was unaware of any financial relationship between Gulotta and Genova.  (*Id.*)  The first time Alderman Gigliotti learned anything about Gulotta's payment of more than $126,000 in legal fees to Genova was in April 2000, when FBI agents came to interview him about the relationship between Gulotta and Genova.  (*Id.*)

12.   Genova also relied on the recommendation of former Illinois State Representative Frank Giglio in appointing Gulotta.  In the 1993 mayoral election, Mr. Giglio supported Genova.  (Stipulation No. 8.)  At some point after Genova became Mayor in 1993, Mr. Giglio told Genova that he should appoint Gulotta as City Prosecutor.  (*Id.*)  Genova's response to this suggestion was along the lines of "are you crazy," but Giglio persisted.  (*Id.*)  Genova eventually agreed to meet with Gulotta.  (*Id.*)

13. After Gulotta was appointed City Prosecutor, he appeared to have great influence with Genova. Gulotta was instrumental in securing various Calumet City legal work for his law partner, Ronald Kawanna. (8/16/01 Tr., at. 69-72.) Gulotta received standard referral fees of 33% for this work. (*Id.* at 95.)

14. After Gulotta was appointed City Prosecutor, he told his former good friend, legal associate and the person for whom he served as mayoral campaign director – Greg Skubisz – that he might be able to get Skubisz some Calumet City legal work, even though Skubisz and Genova were both personal and political rivals.

15. Mr. Skubisz gave detailed, professional and objective testimony, fully credited by this Court, about a May 1995 conversation with Gulotta, his friend and political ally, with respect to the possibility of obtaining Calumet City legal work. (8/10/01 Tr. at 72-74.) During this conversation, Gulotta indicated that Mr. Skubisz could get Calumet City legal work if something would "go back to Genova" in the form of political ticket purchases, contributions or referrals. (*Id.*) Mr. Skubisz's understanding was that the "something that would need to go back to Genova" was in the nature of the standard one-third referral fee for all Calumet City legal work obtained by Mr. Skubisz. Mr. Skubisz rejected Gulotta's suggestion, and he never received any Calumet City legal work. (*Id.)*

16. The Court specifically finds that Mr. Skubisz's testimony about his May 1995 conversation provided a damning inside view of the true nature of Gulotta and Genova's kickback scheme. This testimony is corroborated by all other Government evidence in this case.

17. Both the direct and the circumstantial evidence overwhelmingly established beyond a reasonable doubt that the real reason Genova appointed Gulotta as City Prosecutor and

steered legal work to the Law Firm was that Genova had secretly arranged an illegal attorney fees kickback scheme with Gulotta, whereby Genova would receive payments from Gulotta of approximately one-third of all the legal work invoices paid by Calumet City to the Law Firm without any requirement that Genova perform any real substantive work in exchange for receiving his share of these proceeds. These payments, which totaled approximately $126,000, were in fact bribes paid by Gulotta to Genova to insure that the Law Firm would continue to receive Calumet City legal business in the past, present and future.

18. Between early 1994 and early 1997, Calumet City paid a total of approximately $418,000 in compensation and legal fees to defendant Gulotta and the Law Firm. (Stipulation No. 15.) These payments were paid on the basis of false and incomplete representations and material omissions by Genova and Gulotta that the citizens of Calumet City were receiving competent, conflict-free legal advice for these payments.

19. Beginning in early 1994 and continuing through February 1, 2000, in Calumet City, Illinois, and elsewhere in the Northern District of Illinois, Genova and Gulotta devised, intended to devise, and participated in, a scheme and artifice to defraud the people of Calumet City of their intangible right to the honest services of Genova and Gulotta, and to obtain money and property from the people of Calumet City, by means of material false and fraudulent pretenses and representations.

20. Beginning in or before February 1994, Genova and Gulotta reached an agreement in which Gulotta agreed to make payments of money to Genova, purportedly as compensation for legal work performed by Genova as a "contract" employee working for, and retained by, Gulotta and the Law Firm. In fact, these payments were intended as bribes and

kickbacks to Genova for exercising the power of his office to cause Calumet City to award legal

work to Gulotta and the Law Firm and, as intended and agreed by Genova and Gulotta, Genova

would not actually have to perform at least the substantial part of this purported legal work.

21. In or about February 1994, Gulotta started billing clients of the Law Firm for

legal work supposedly performed by Genova and making payments of money to him for this

purported legal work. These payments of money to Genova totaled approximately $126,000

between early 1994 and early 1997.

22. Both Genova and Gulotta failed to disclose to any third person the true extent

of the substantial financial relationship which existed between Genova, Gulotta and the Law

Firm. This repeated failure to disclose and concealment of evidence is strong circumstantial

proof of Genova and Gulotta's fraudulent intent.

23. Genova failed to disclose any of the payments of money he received from

Gulotta and the Law Firm on the Statement of Economic Interest forms Genova filed, and caused

to be filed, with the Cook County Clerk in 1994, 1995, 1996, 1997 and 1998. (Gov't Ex.,

Genova Statement of Economic Interest.) Yet, in his 1993 Statement of Economic Interest form,

Genova properly disclosed legal services he had rendered to the State's Attorney's Appellate

Prosecutor and the Office of the Chief Judge of the Circuit Court of Cook County. (*Id.*)

24. The 1996, 1997 and 1998 Statement of Economic Interest forms were all

caused to be mailed to the Cook County Clerk through the U.S. mails by Genova, and such

mailings were reasonably foreseeable to Gulotta and aided and abetted by him.

25. Genova failed to disclose to the City Council or publicly the nature and extent

of his interest in the Calumet City legal business conducted by Gulotta and the Law Firm,

including his receipt of money from Gulotta and the Law Firm between 1994 and 1997, prior to, during or after deliberations by the City Council, concerning any of the compensation and legal fees paid to Gulotta and the Law Firm and Genova's requests to reappoint Gulotta as City Prosecutor. (Gov't Ex., City Council Minutes Group A-D.)

26. Various members of the City Council testified that Genova's ongoing business relationship would have been relevant and material to their decision to appoint Gulotta as City Prosecutor.

27. When specifically questioned about his employment and income-generating activities in a deposition involving a civil lawsuit against him in his capacity as Mayor, Genova never mentioned doing any work for the Law Firm. (Gov't Exs., 1/29/98 Genova Dep. & 7/19/99 Genova Dep.; Stipulation Nos. 5 & 25-26. )

28. As originally intended by Genova and Gulotta, Genova did not actually perform the substantial part of the purported legal work.

29. To the extent that Genova performed actual legal work for Gulotta or the Law Firm, this work was intended, at least in part, to mask and conceal the false and fraudulent nature of the payment to Genova, including the fact that these payments were intended as bribes and kickbacks to Genova for exercising the power of his office to cause Calumet City to award legal work to Gulotta and the Law Firm.

30. Between early 1994 and 1997, Gulotta submitted false and fraudulent bills to clients of the Law Firm, including the City of Chicago Heights ("Chicago Heights"), for legal work supposedly performed by Genova, which legal work was not actually performed by Genova. The false and fraudulent bills submitted by Gulotta and the Law Firm included:

a. Hundreds of fictitious hours of legal work by Genova for which no contemporaneous billing records were maintained by either Genova or Gulotta;

b. Many hours of work claimed by Genova which were in fact performed by other attorneys employed by the Law Firm;

c. Many hours of work claimed by Genova which could not be performed given his other activities, including his official duties as Mayor and his unofficial political endeavors;

d. In August and September of 1995, Genova received payments which totaled $8,700 for alleged work done "in preparation" for an appeal in the case of *Flores v. Chicago Heights*, which the Law Firm had already won at the trial court level. This appeal was settled for $5,000 before the unsuccessful plaintiff ever filed its initial brief. (8/16/01 Tr. at 30-32.)

e. In or about October 1995, a client of the Law Firm, Chicago Heights, was billed for legal work supposedly performed by Genova, including, "trial preparation," when, in fact, Genova was vacationing in Italy during the period covered by the billing; and

f. In or about July 1996, a client of the Law Firm, Chicago Heights, was billed for legal work supposedly performed by Genova, including "review of trial records," when, in fact, Genova was vacationing in Florida during the period covered by the billing.

g. From July to October 1996, Genova was paid $7,700 by the Law Firm for legal work supposedly done by Genova on the *Jones v. Chicago Heights* appeal. Genova did not have any invoices for this work. The invoices provided by the Law Firm to Chicago Heights for this work did not correspond to the work allegedly done by Genova.

h. From October to December 1996, Genova was paid $6,700 for work on the *Wade v. Chicago Heights* appeal. No invoices were submitted by Genova for these payments. One payment check of $3,500 from Gulotta to Genova contained a memo section which indicated: "Retainer Re: 2nd Wade Appeal." (Gov't Ex., Antonietti & Gulotta/Gulotta & Kawanna Checks and Deposit Slips; Stipulation No. 16.) The Law Firm billed 87.75 hours for this appeal. Genova billed 60 hours for this appeal. Yet, the record

established that the main work on this appeal for the Law Firm (approximately 78 hours) was conducted by contract attorney Sara Razani, who was the principal author of the appellate brief submitted by the firm.

31. With only one notable exception - Ronald Kawanna - all employees, clients and opponents of the Law Firm consistently indicated that they had no knowledge of any actual legal work performed by Genova for the Law Firm. Most of this testimony was uncontested and presented by stipulation. (*See, e.g.* Stipulation 37-53, 57-58, 74.) On this score, the Court specifically finds the testimony of all the Government witnesses consistent, abundant and credible. In contrast, the Court specifically finds the testimony of Mr. Kawanna to be inconsistent, incredible and intentionally false.

32. Ronald Kawanna, a duly licensed attorney in Illinois since 1985, knowingly and willfully gave false material testimony during the trial. (8/16/01 Tr. at 1-156.) This Court finds Mr. Kawanna's testimony preposterous and intentionally false in light of all the other evidence. Instead of testifying as an officer of the Court, Mr. Kawanna's demeanor on the witness stand, which included his facial expressions, tone of voice, eye contact, posture and body movements, was openly hostile to the Government and totally biased in favor of Gulotta's only defense; that is, that Genova actually performed all of the legal work for which he was paid.

33. Mr. Kawanna's false testimony was driven by his long ties to Gulotta and his vested business interests in the Law Firm, as well as the work it received from Genova. Mr. Kawanna was hired as a part-time janitor by Gulotta in 1979 while attending college. (*Id.* at 3.) Since that time, Gulotta has assisted Mr. Kawanna and was instrumental in his law career. (*Id.* at 3-6.) Essentially, Mr. Kawanna has always worked either for and/or with Gulotta. (*Id.* at 81-88.)

To this day, through an arrangement facilitated by Gulotta, Mr. Kawanna receives individual Calumet City legal work separate and apart from the Law Firm's work for Calumet City. (*Id.* at 69-72.) Notably, Mr. Kawanna pays Gulotta a standard one-third referral fee for all this work. (*Id.* at 95.) Mr. Kawanna also shares in the total profits of the Law Firm with Gulotta. (*Id.* at 38-40, 80-81.) These profits are dependent on the Law Firm's Calumet City legal business. (*Id.* at 41-43, 89-90.) Yet, Mr. Kawanna falsely testified that his only interest in this case was "to tell the truth." (*Id.* at 67.)

34. Mr. Kawanna falsely testified that Genova's bonafide legal work for the Law Firm consisted largely of participating in various strategy meetings at the Law Firm. (*Id.* at 11, 44, 48-49, 58-59, 62, 74, 77, 128-132.) This testimony was impeached by Mr. Kawanna's prior grand jury testimony (*Id.* at 137). No documentation of any type existed for these "strategy" meetings. (*Id.* at 14.) Mr. Kawanna testified that Genova was involved extensively in various pretrial legal work including the preparation of legal research and *motions in limine*, yet no documentation exists for any of this work. (*Id.*)

35. Both Gulotta and Genova were required to turn over all available documentation with respect to Genova's "alleged" work for the Law Firm. (Gov't Exs., 12/15/99 Gulotta Subpoena; 12/15/99 Kawanna Subpoena; 12/15/99 Genova Subpoena; Stipulation Nos. 23-24.) Very few records were available. In fact, Genova's attorney indicated that Genova had no records responsive to the grand jury's request for bills, invoices, correspondence or time summaries for the disputed legal work. (Gov't Ex., 1/24/00 Letter.)

36. The only independent documentation of Genova's legal work, other than Mr. Kawanna's false testimony, consists of two isolated courtroom transcripts. Neither of these

transcripts serves to establish actual work done by Genova. (Stipulation Nos. 54-55.) Instead, they merely indicate his presence in two separate courtrooms, and at best establish a minimal and de minimis amount of attorney time. (*Id.*) Furthermore, Genova's presence in these two cases did not serve to undermine his fraudulent scheme with Gulotta since few people attended these proceedings, which were not covered by any media representative.

37. Mr. Kawanna's false testimony claimed that Genova was specifically hired to replace Judge Antonietti in 1994 and to work on the Chicago Heights cases. (*Id.* at 5.) Genova, however, was a relatively inexperienced lawyer who did not have Judge Antonietti's matrimonial and probate law expertise. (8/16/01 Tr. at 98-99.) Furthermore, Judge Antonietti's legal work was not primarily devoted to municipal defense representation. (*Id.*) Finally, it is apparent that the Law Firm's principal expansion of business in 1994 came from the new Calumet City legal business. (*Id.* at 90.) It is a reasonable inference to conclude that, but for the illegal attorney fees kickback scheme, Gulotta would not have hired the only lawyer in this country who admittedly was conflicted from assisting with this work – the Mayor of Calumet City.

38. There are few, if any, court documents which evince actual legal work performed by Genova for the Law Firm. At best, the evidence shows that Genova may have done some work on the initial appellate brief in *Rambo v. Daley.* (Defs.' Ex. 2.)

39. Numerous attorney opponents, actual clients and employees of the Law Firm testified by stipulation that they were never aware of any legal work performed by Genova for the Law Firm. This abundant testimony supports the conclusion that Genova's arrangement with Gulotta and the Law Firm was a complete sham.

18

40. There is an unexplainable absence of any work product documents or detailed correspondence surrounding any alleged legal work performed by Genova for the Law Firm. The practice of law is a public profession which should result in work which can be documented. This is especially true for litigation work -- the type of work allegedly performed by Genova. The practice of law is not a secretive, isolated and monastic profession.

41. As a trier of fact, the Court can, just like the jury, rely on its own life experience and common sense. This Court has had a diverse legal experience which includes legal practice in three-person lawyer settings as well as two of Chicago's larger law firms. This Court's diverse twenty-year experience leads it to conclude that the legitimate practice of law is a public profession which always results in work which can be documented in some fashion via: computerized research work; contemporaneous billing records; detailed billing statements; draft work product; final work product; correspondence; deposition and trial transcripts; internal and external legal memorandums; appearance forms; legal pleadings and the testimony of fellow office workers, legal opponents, colleagues, administrators and court personnel.

42. The Court's extensive and careful review of all the available records, including all the work product produced by the Law Firm, discloses that Genova's claimed work was simply bogus and blatantly false. There are hundreds of hours for which Genova was paid where no invoices of any kind exist. There are no legal memoranda or correspondence authored by Genova. The only correspondence by Genova is a few invoices to Gulotta which merely request lump sum payments without any specific itemization of legal work performed. (Gov't Ex., Genova Invoices.) Many of these invoices request large payments for "legal research," "legal services" or as a "retainer." Furthermore, even these conclusory invoices only covered

19

approximately $28,000 of the total fees of $126,000 Genova was paid. (8/16/01 Tr.) It is also impossible to determine if these isolated Genova invoices were prepared contemporaneously or after the fact in an attempt to partially justify the various payments made by Gulotta to Genova. Similarly, the Law Firm's legal invoices to the City of Chicago Heights only generically lump together time spent by attorneys Gulotta, Kawanna and Genova and do not itemize any work. (Gov't Ex., Gulotta & Kawanna Chicago Heights Invoices.)

43. Genova's legal work as a contract attorney for the State's Attorney's Appellate Prosecutor resulted in properly disclosed work, as well as contemporaneous and detailed legal invoices. (Gov't Ex., Genova Illinois Appellate Records.) Thus, there is evidence that Genova knew how to properly bill and disclose real legal work.

44. Other contract lawyers employed by the Law Firm, such as Sara Shirin Razani and Charles E. Antonietti, all performed legal work which was well documented, unlike the alleged legal work performed by Genova. (Gov't Ex., Razani Binder.)

45. Unlike Gulotta's treatment of other legal services providers, who had to wait for their payment, Gulotta had a pattern of making prompt payments for all of Genova's bogus legal invoices even though the Law Firm itself had not received payment for these fictitious services. (8/14/01 Tr.) These unusually quick payments show that Gulotta was trying to keep his co-schemer Genova happy with their illegal arrangement.

46. In or about 1994, Gulotta caused the Law Firm to provide Genova with approximately $19,451 in illegal payments for fictitious legal services which were never substantially performed by Genova.

47. In or about 1995, Gulotta caused the Law Firm to provide Genova with approximately $62,775 in illegal payments for fictitious legal services which were never substantially performed by Genova.

48. In or about 1996, Gulotta caused the Law Firm to provide Genova with approximately $38,725 in illegal payments for fictitious legal services which were never substantially performed by Genova.

49. In or about 1997, Gulotta caused the Law Firm to provide Genova with approximately $5,150 in illegal payments for fictitious legal services which were never substantially performed by Genova.

50. The Court concludes that the reason Genova's legal bills were reduced in 1997 was the return of Judge Antonietti to the Law Firm. Judge Edward A. Antonietti was a partner at the Law Firm prior to his appointment to the Circuit Court of Cook County in 1994. In 1997, Judge Antonietti returned to the Law Firm for a period of time before returning to the bench. The Court specifically finds that Judge Antonietti's integrity is beyond reproach and that Gulotta and Genova were both aware that their attorney fees kickback scheme would be readily detected by Judge Antonietti.

51. During the same time period of Genova and Gulotta's scheme to defraud the citizens of Calumet City of property, in the form of the legal fees which were the subject of the kickback agreement, and their intangible right to the honest services of Genova and Gulotta, Genova committed various other acts which disclosed his intent to use the power of his office as Mayor in a manner which resulted in financial gain to himself but resulted in financial loss to the citizens of Calumet City.

52. In each calendar year between 1993 and 1999, Calumet City received in excess of $10,000 in federal grants and assistance. (Stipulation No. 8.)

53. The checks and deposit slips contained in the Gov't Ex., Antonietti & Gulotta/Gulotta & Kawanna Bank Records, show that between February 9, 1994 and June 24, 1997, the Law Firm paid Genova $126,101.50 specifically as follows: (1) in 1994, $19,452.50; (2) in 1995, $62,775.00; (3) in 1996, $38,725.00; and (4) in 1997, $5,150.00. (Stipulation No. 16.)

54. At his claimed hourly rate of $100.00, Genova supposedly received compensation for 1,261 hours of legal work. This Court has personally reviewed all the available documentation in this case which relates in any fashion to this legal work. There are simply no records which document this amount of legal work or anything close to this amount. At best, the Court can only conclude that Genova might have worked less than ten percent of the total claimed, and even this amount of time is open to serious question.

55. Legal work in the amount of 1,261 hours easily represents almost a full year of work for a full-time lawyer. Very few lawyers are able to legitimately bill eight hours of work in a full work day. Even if Genova were one of these able attorneys, his 1,261 hours would represent 157 days of full-time legal work while serving as a full-time Mayor with a healthy political and vacation schedule. (Gov't Ex., Genova American Express Records; Gov't Ex., Genova Calendars Group A-C; Stipulation No. 22; 8/2/01 Stevens Tr.) In fact, Genova's extensive political schedule was geared toward a 1998 run for statewide office following his 1997 re-election. The idea that Genova could legitimately accomplish his claimed legal work with his arduous schedule and without any significant corroboration is simply unreasonable,

especially in view of all of the Government's evidence which directly and circumstantially established beyond a reasonable doubt that Genova simply did not accomplish the legal work he was paid for by the Law Firm.

56. During the trial, the Court received testimony from Robert P. Cummins, the Government's expert witness on legal ethical obligations. (8/15/01 Tr.) Mr. Cummins has had an extensive legal career, which includes public service with the Attorney Registration and Disciplinary Commission and as Chairman of the Judicial Inquiry Board. This Court fully credits the testimony of Mr. Cummins.

57. Mr. Cummins testified, and this Court agrees, that Gulotta and the Law Firm never provided conflict-free representation to Calumet City because of the hidden relationship with Genova. As detailed by the Court's factual findings, the attorney fees kickback scheme by Genova and Gulotta constituted a theft by deception with respect to all of the fees paid by Calumet City to Gulotta and the Law Firm.

58. Ms. Kathleen Creighton, a certified public accountant and auditor employed by the U.S. Attorney's Office, testified about the summary results of her extensive review of the available billing records maintained by the Law Firm, as well as Genova's few invoices (8/14/01 Tr.) The Court fully credits Ms. Creighton's detailed, professional and objective testimony. Ms. Creighton prepared certain summary charts which were admitted into evidence. These admitted summary charts provided strong circumstantial evidence of the true extent of the attorney fees kickback scheme.

## CONCLUSIONS OF LAW BY THE COURT

## I. Relevant Duties of Attorneys Under Illinois Supreme Court Rules

The Illinois Rules of Professional Conduct, which became effective on August 1, 1990, and which are similar to the Rules of Professional Conduct adopted by this Court, remind all attorneys that "the practice of law is a public trust." Preamble to the Illinois Rules of Professional Conduct, Article VIII. At a basic level these rules prohibit conflicts of interests without full disclosure, *see id.*, Rules 1.7-1.ll, and prohibit criminal acts or other misconduct, *see id.*, Rules 8.3 and 8.4.

Illinois Supreme Court Rule 769 also specifically requires each attorney to maintain the following records:

> (1) records which identify the name and last known address of each of the attorney's clients and which reflect whether the representation of the client is ongoing or concluded; and
>
> (2) all financial records related to the attorney's practice, for a period of not less than seven years, including but not limited to bank statements, time and billing records, checks, check stubs, journals, ledgers, audits, financial statements, tax returns and tax reports.

Ill. Sup. Ct. R. 769.

## II. Relevant Municipal Laws, Ordinances and Ethical Duties

In discharging their public duties, the executive officers of Calumet City had the following relevant legal and ethical duties:

a. By virtue of their positions, the Mayor and other executive officers of Calumet City owed a fiduciary duty and a duty of honest services to the people of Calumet City in the performance of their public duties.

b. Pursuant to the Illinois Governmental Ethics Act, the Mayor was required to file an annual written Statement of Economic Interest form with the Cook County Clerk, wherein he was obligated to disclose: ( i) the name, address and type of practice of any professional organization in which he was an officer, director, associate, partner or proprietor, or served in any

advisory capacity, from which he derived income in excess of $1,200 during the preceding calendar year; and (ii) the nature of professional services rendered (other than services rendered to Calumet City) and the nature of the entity to which the professional services were rendered if fees exceeding $5,000 were received by the Mayor during the preceding calendar year from the entity for professional services rendered by the Mayor. 5 ILCS 420/4A – 101 and 107. The Ethics Act requires that each Statement of Economic Interest be completed in a manner that is truthful, correct and complete, and provides that any person who willfully files a false or incomplete Statement shall be guilty of a Class A misdemeanor. (Stipulation No. 17.)

c. Pursuant to the laws of the State of Illinois, the Mayor, as a person holding public office, was precluded from: (1) being in any manner interested, either directly or indirectly, in his own name or in the name of any other person, association, trust or corporation, in any contract or the performance of any work in the making or letting of which the officer may be called upon to act or vote; and (2) taking or receiving, or offering to take or receive, either directly or indirectly, any money or other thing of value as a gift, bribe or means of influencing his vote or action in his official character. 50 ILCS 105/3.

d. Pursuant to the Municipal Code of Calumet City (the "Municipal Code"), the Mayor and the City Prosecutor, as city officers, were precluded from being interested, directly or indirectly, in any contract, work or business of the City, whenever the expense, price or consideration of the contract, work or business was paid from the treasury. Calumet City Municipal Code § 2-22.

**III. Genova and Gulotta's Attorney Fees Kickback Scheme
    Repeatedly Violated the Federal Mail Fraud Statute**

To establish the crime of mail fraud, the Government must prove: (1) the defendant's participation in a scheme to defraud; (2) the defendant's intent to defraud; and (3) the defendant's use of the mail in furtherance of the fraudulent scheme. *See United States v. Ross*, 77 F.3d 1525, 1542 (7th Cir. 1996). In the instant case, all of these elements were established beyond a reasonable doubt.

As detailed in this Court's findings of fact, the scheme established by the Government was a basic fraud scheme; namely, an effort by Gulotta to bribe Genova in his capacity as Mayor of Calumet City with money. As to Genova, it was a sham scheme to receive money for little or no consideration in return for influencing the continued selection of Gulotta as City Prosecutor and as an attorney providing legal services to Calumet City. The Government established this scheme beyond a reasonable doubt. *See, e.g., United States v. Keane*, 522 F.2d 534, 545-46 (7th Cir. 1975) (citations omitted). At its core, this scheme was an effort to enrich both Gulotta and Genova in an improper manner.

Another key aspect of the scheme involved the deceitful non-disclosure of Genova's financial interests in the Law Firm. The Seventh Circuit has long held that "one who breaches the public trust by actively concealing a personal financial interest from the public and from a public body charged with the responsibility of passing judgment on matters directly affecting that financial interest, and on which he serves and in which he participates in the formulation of the collective judgment of that body, pursuant to his official duties, may be prosecuted for mail fraud." *Id.*, 522 F.2d at 546 (citations omitted). *See also United States v. Holzer*, 816 F.2d 304, 307-11 (7th Cir. 1987) (a public official who deliberately fails to disclose a material conflict of interest violates the mail fraud statute). This is almost exactly what occurred in the proven

scheme here. Genova consistently failed to disclose his financial interests in the Law Firm to the Calumet City Council when it was considering its use of the Law Firm's services. *See, e.g., United States v. Silvano*, 812 F.2d 754, 760 (1st Cir. 1987) (an official's intentional violation of the duty to disclose provides the requisite deceit). This concealment was aided and abetted by Gulotta throughout the scheme to secure continued Calumet City legal business for the Law Firm. *See, e.g., United States v. Isaacs*, 493 F.2d 1124, 1151 (7th Cir.) (public officials who received bribes intended to induce special favors and preferential treatment properly convicted of mail fraud where only one of the co-schemers used the mail to execute the scheme), *cert. denied*, 417 U.S. 976 (1974).

The final part of the scheme involved the deprivation of the intangible rights of the citizens of Calumet City. Intangible mail fraud prosecutions have long generated a tension concerning the creation of a gray area of federal common-law crimes. *See United States v. George*, 477 F.2d 508, 512 (7th Cir. 1973). This tension ultimately culminated in the Supreme Court's disapproval of this broad prosecutorial vehicle in *McNally v. United States*, 483 U.S. 350 (1987). In 1988, however, Congress clarified that the term "scheme or artifice to defraud" used in the mail fraud statute includes "a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.

The Seventh Circuit has expressed some concern that the re-enacted "intangible rights" doctrine still invites prosecutorial overreaching and the possible creation of an evolving class of federal common-law crimes. *See United States v. Martin*, 195 F.3d 961, 965 (7th Cir. 1999); *United States v. Bloom*, 149 F.3d 649, 655-56 (7th Cir. 1998). In *Martin*, then Chief Judge Posner noted that there could be two views of mail fraud: The narrow view was that the mail

fraud statute merely backed up state criminal law by denying the use of the postal service, while the broad view protected the public from any type of fraud that used the mails. *Martin*, 195 F.3d at 967. Judge Posner acknowledged that many cases favored the broad view. *Id.* He also recognized, however, that "[i]t can be argued that tying the concept of fraud in the mail fraud statute to state law and to federal statutes expressly creating fiduciary duties would allay the persistent concerns about the breadth and vagueness of the statute." *Id.*

The *Martin* opinion was predated by Judge Easterbrook's earlier opinion in *United States v. Bloom. Bloom* succinctly traced the history of the intangible rights theory of mail fraud and concluded that misuse of a public position for private gain is the line that separates run of the mill violations of state law fiduciary duty from federal crime. *Bloom*, 149 F.3d at 655-56. Judge Easterbrook specifically noted that this bright line had long been accepted prior to the Supreme Court's decision in *McNally*, which was overruled by Congress' enactment of § 1346. *Id.*

This well-established bright line was violated by Genova and Gulotta's attorney fees kickback scheme. This scheme involved the breach of statutorily created fiduciary duties <u>and</u> the misuse of both defendants' public positions for their private gain. Both Gulotta and Genova deprived their employer – Calumet City – of their honest services by misusing their positions for their personal gain. In addition, each defendant aided and abetted each other's fraud.

While it may not be clearly evident how far the intangible rights theory of criminal responsibility will extend after Congress' enactment of § 1346, the Government established beyond a reasonable doubt that Genova and Gulotta's secret, illegal and conflict-ridden attorney fees kickback scheme fell within the heartland of § 1346's prohibition. *See, e.g., United States v.*

*Brumley*, 116 F.3d 728 (5th Cir. 1997) (defendant "borrowed" money, never repaid, from lawyers who appeared before his commission).

This Court concludes that the scheme to defraud and intent to defraud by Gulotta and Genova was overwhelmingly established beyond a reasonable doubt. Gulotta's own acts, which include his May 1995 admissions to Mr. Skubisz and his misrepresentations, established his intent to defraud. These statements were properly admitted as party submissions as well as co-conspirator statements. *See Bourjaily v. United States*, 483 U.S. 171, 175 (1987). It is well established that evidence of concealment can circumstantially establish bad intent. *See United States v. Waldemer*, 50 F.3d 1379, 1385 (7th Cir. 1995) (holding that, where an attorney lied to a grand jury and concealed illegal reimbursements, "positing a theory of the defendant's state of mind from circumstantial evidence is acceptable"); *United States v. Henderson*, 645 F.2d 569, 576 (7th Cir. 1981) (finding that, where there was sufficient evidence to support the inference that defendant concealed the existence of a prior security interest for the purpose of influencing local banks to make improper loans, "proof of intent through the use of circumstantial evidence in such cases is not unusual") (citing *United States v. Miller*, 573 F.2d 388, 391 (7th Cir. 1978)). Gulotta and Genova's actions and misrepresentations, in light of all the facts and circumstances as they appeared during the relevant times, established beyond a reasonable doubt their joint intent to defraud.

Additionally, the other crimes charged in the indictment which this Court concludes were in fact committed by Genova, in abuse of his mayoral powers, constitute Rule 404(b) evidence which the Court can properly consider in evaluating Genova's intent to take improper advantage of his office. Fed. R. Evid. 404(b). This other crime evidence strongly established an intent to

29

defraud by Genova. This evidence showed that Genova repeatedly opened up the public treasury of Calumet City for numerous raids by his friends and political allies. The Seventh Circuit has repeatedly held that it is proper to use other acts evidence to establish intent where a defendant is charged with a specific intent crime. *United States v. Lewis*, 110 F.3d 417, 420 (7th Cir. 1997); *United States v. Chaimson*, 760 F.2d 798, 808 (7th Cir. 1985).

Finally, the Court concludes that the Government established that Genova and Gulotta caused the mails to be used in furtherance of their illegal scheme. A mail fraud violation occurs when someone "for the purpose of executing [a] scheme or artifice [to defraud] or attempting so to do," places in the mails something to be delivered by a mail carrier. 18 U.S.C. § 1341. *See also Keane*, 522 F.2d at 551. A defendant does not have to personally mail something to be guilty of mail fraud. *Keane*, 522 F.2d at 551. He need only cause it to be mailed or to commit some act that would cause the mailing to be reasonably foreseeable. *Id.* In this case, Genova caused each of his Statement of Economic Interest forms to be mailed to the Cook County Clerk, and Gulotta is criminally liable for this act as a co-conspirator and co-schemer. *Pinkerton* v. *United States*, 328 U.S. 640 (1946). Additionally, Gulotta is criminally liable because he constantly aided and abetted the scheme by continuing to pay Genova for little or no legal work and by intentionally failing to disclose the true nature of his secret kickback scheme with Genova.

Moreover, the use of the mails was quite reasonably foreseeable to Gulotta. The mails were used to transmit bogus legal invoices and correspondence throughout the scheme. Furthermore, Gulotta, the City Prosecutor and a licensed attorney who specialized in municipal law, was well aware of the ethical disclosure requirements faced by Genova. Specifically, this

30

Court finds that it was reasonably foreseeable to Gulotta that the mails would be used by Genova to transmit the false Statement of Economic Interest forms, charged in Counts Two, Three and Four, to the Cook County Clerk. Each of these false Statement of Economic Interest forms furthered the scheme by concealing the fact that Genova and Gulotta had a joint economic interest in the Law Firm.

The use of the mails element of mail fraud may be proved by direct or circumstantial evidence. *Whealton v. United States*, 113 F.2d 710, 713 (3rd Cir. 1940). In this case, the proof of mailing was established by prior grand jury testimony and direct testimony regarding Genova's standard office practice as Mayor. All relevant witnesses testified that it was the normal office practice to mail Genova's Statement of Economic Interest forms to the Cook County Clerk. These statements for the respective years 1996, 1997 and 1998 were the mailings alleged in Counts Two, Three and Four. It has long been held that testimony regarding standard office practice is sufficient circumstantial proof of the use of mails, so long as the circumstances proven directly support the inference and exclude all reasonable doubt to the extent of overcoming the presumption of innocence. *United States v. Ledesma*, 632 F.2d 670, 675 (7th Cir. 1980). This standard was met by the Government's evidence. Strong circumstantial evidence exists with respect to the mailing of each of the relevant Statement of Economic Interest forms. Each statement was signed or authorized to be signed by Genova. Various witnesses testified that these statements were regularly mailed to the County Clerk. In addition, the time lag between the signing date and filed date provides strong circumstantial evidence that the mailing routine was in fact followed. The Court concludes that no reasonable doubt exists that each of the charged Statement of Economic Interest forms were in fact mailed through the U. S. mails.

## IV. Genova and Gulotta's Attorney Fees Kickback Scheme
## Repeatedly Violated the Illinois Official Misconduct Laws

The findings of fact and conclusions of law regarding the mail fraud counts vividly

illustrate why Genova and Gulotta's attorney fees kickback scheme also violated Illinois criminal

law. At the heart of this scheme is simply a bribe being paid by Gulotta and being accepted by

Genova to influence his past, present and future use of Gulotta as City Prosecutor and the Law

Firm to perform legal work for Calumet City. As charged in the indictment and as proven at

trial, this type of bribery scheme violated the Illinois Official Misconduct laws, which broadly

prohibit a public officer or employee from knowingly performing an act which he knows he is

forbidden by law to perform or soliciting or knowingly accepting for the performance of any act a

fee or reward which he knows is not authorized by law. 720 ILCS 5/33-3 (b) and (d). The

purpose of the official misconduct laws is to compel public officials and employees "to act in a

lawful manner and to maintain the public trust." *People v. Becker*, 734 N.E.2d 987, 995 (Ill.

App. Ct. 2000) (citation omitted). The laws are "intended to punish activities of public officials

who have exploited their official positions to the detriment of public good." *Wright v. Danville*,

675 N.E.2d 110, 118 (Ill. 1996). This is exactly what occurred in this case. Genova and Gulotta

both exploited their official positions to obtain personal, financial advantage to the detriment of

the public good. Genova and Gulotta's scheme expressly violated 50 ILCS 10 5/3 and Calumet

City Municipal Code Section 2-22, which prohibited city officers from having hidden interests in

the official work and contracts of Calumet City. Both Genova and Gulotta had clear conflicts of

interests. Neither could take official action or give official advice which was free from the

conflict created by their secret and illegal economic partnership. This was a blatant violation of

the Illinois Official Misconduct laws. *See People v. Scharlau*, 565 N.E.2d 1319, 1326-28 (Ill. 1990); *People v. Savaiano*, 359 N.E.2d 475, 479-81 (Ill. 1976).

## V. The Defendants' Kickback Scheme Repeatedly Violated the Illinois Bribery Statute

As indicated in the prior sections of this opinion, at its very core the attorney fees kickback agreement was a simple bribery scheme which repeatedly violated the Illinois Bribery Statute. The agreement was a classic *quid pro quo* agreement which went as follows: In return for one-third of all attorney fees collected, Genova used his official powers as Mayor to direct Calumet City legal work to Gulotta and the Law Firm. Furthermore, Genova was not required to perform any legal work to receive his one-third share. In this bribery scheme, unlike the real world, genuine legal work was optional and was only performed by Genova when he was so inclined, or in an effort to conceal the real purpose of this scheme. No one can legitimately contest that this scheme was in direct violation of the Illinois Bribery Statute. The statute indicates, in relevant part, that a person commits bribery when:

> (a) With intent to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness, he promises or tenders to that person any property or personal advantage which he is not authorized by law to accept; or
>
> * * *
>
> (d) He receives, retains, or agrees to accept any property or personal advantage which he is not authorized by law to accept knowing that such property or personal advantage was promised or tendered with intent to cause him to influence the performance of any act related to the employment or function of any public officer, public employee juror or witness . . . .

720 ILCS 5/33-1(a) and (d).

A mere offer or promise with requisite intent is sufficient to constitute bribery under Illinois law. *People v. Wallace*, 312 N.E.2d 263, 266 (Ill. 1974). In fact, under Illinois bribery law, "[n]o particular act need be contemplated by the offeror or offeree. There is bribery if the offer is made [to a public official] with intent that the offeree act favorably to the offeror when necessary." *Isaacs*, 493 F.2d at 1145. *See also United States v. Hogan*, 886 F.2d 1497, 1503-04 (7th Cir. 1989).

Gulotta's payments to Genova repeatedly violated ¶ 33-1 (a) because his bogus payments for fictitious legal work were solely intended to influence his past, present and future appointment to represent Calumet City. Similarly, Genova's repeated receipt of illicit payments from Genova for non-existent or sham legal work repeatedly violated ¶ 33-1(d) because these illegal payments were received to influence his performance of official acts as Mayor of Calumet City.

## VI. The Defendants' Attorney Fees Kickback Scheme Violated the Federal Racketeering Act

To establish a Federal Racketeering ("RICO") violation, the Government needed to establish that a defendant engaged in "(1) conduct (2) of an enterprise (3) through a pattern of racketeering activity." *United States v. Torres*, 191 F.3d 799, 805 (7th Cir. 1999) (citation omitted). As indicated in the Court's finding of facts, each of these elements was established beyond a reasonable doubt.

In the specific attorney fees kickback scheme established by the Government, Gulotta's and Genova's repeated respective payment and receipt of bribery funds for non-existent legal

work constituted appropriate racketeering acts on multiple levels, as indicated in this Court's prior conclusions of law and the jury's verdict.[1] Both Genova and Gulotta knowingly conducted and participated in the conduct of the affairs of Calumet City through a pattern of illegal activities which included repeated violations of the mail fraud and Illinois Bribery and Official Misconduct Statutes throughout a three-year period. Throughout these repeated racketeering acts, Calumet City was used as an enterprise by Genova and Gulotta to conduct illegal activities. *United States v. Lee Stoller Enterprises*, 652 F.2d 1313, 1319 (7th Cir. 1981) (governmental entity can constitute a proper RICO enterprise).

The term "racketeering activity," of course, expressly includes mail fraud offenses as well as any other state offense which includes "bribery". 18 U.S.C. § 1961(1). Additionally, under the circumstances of this case, each violation of the Illinois Bribery and Official Misconduct Statutes constitutes a proper RICO predicate act. As the Seventh Circuit Court of Appeals expressly held in *United States v. Garner*, 837 F.2d 1404, 1418 (7th Cir. 1987), a label placed on a state statute does not control whether an alleged violation of that statute can be a proper RICO predicate act. *Garner* involved the acceptance of unlawful cash payments by municipal sewer workers. The *Garner* Court held that since the Illinois Official Misconduct Statute proscribed bribery in the generic sense it could serve as a predicate act under RICO. Similarly, in this case the proven attorney fees kickback agreement is fundamentally a bribery scheme.

---

[1] To the extent that this opinion differs from the jury's verdict with respect to Genova, it does not indicate a lack of respect for the diligent work accomplished by the jury in this case. Instead, it merely reflects this Court's independent role as a trier of fact in this concurrent bench trial. These minor inconsistencies were probably the result of the jury's compromise and lenity in reaching its verdict. *See United States v. Powell*, 469 U.S. 57, 65 (1984).

RICO defines a "pattern of racketeering activity" as requiring at least two acts of racketeering activity committed in a ten-year period. 18 U.S.C. § 1961(5). To establish a pattern, the government must show that the predicate acts of racketeering by the defendants are related and that they amount to or pose a threat of continued criminal activity. The jury and this Court have both properly found that this required pattern was repeatedly established by the multiple predicate racketeering acts of mail fraud, bribery and official misconduct committed by Genova and Gulotta over the course of a substantial period of time in excess of three years and within a ten-year period. *See United States v. Stodola*, 953 F.2d 266, 270 (7th Cir. 1992), *cert. denied*, 506 U.S. 834 (1992).

## VII. The Defendants' Attorney Fees Kickback Scheme Constituted a Theft by Deception of Calumet City Municipal Funds Obtained From the Federal Government

The portion of 18 U.S.C. § 666 that Defendants Genova and Gulotta are charged with violating, in Counts Five and Six of the Indictment, provides in pertinent part that:

> (a) Whoever, if the circumstances described in subsection (b) of this section exists--
>> (1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof--
>>> (A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that--
>>>> (i) is valued at $5,000 or more, and
>>>> (ii) is owned by, or is under the care, custody, or control of such organization, government, or agency; or
>>> (B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more;
>> shall be fined under this title, imprisoned not more than 10 years, or both.

18 U.S.C. § 666. The broad language of § 666 does not require a tracing of federal funds to the

city affected by the loss – whether it be Calumet City or Chicago Heights – or a showing that

Genova and Gulotta had the authority to administer federal funds. *United States v. Simas*, 937

F.2d 459, 463 (9th Cir. 1991) (concluding that the government was not required to trace federal

funds to the project affected by defendant's bribery scheme to establish his violation of § 666).

*See also United States v. Grossi*, 143 F.3d 348, 350 (7th Cir. 1998) (maintaining that "it is not our

part to trim § 666 by giving its text a crabbed reading" and that "money is fungible and its effect

transcends program boundaries" in affirming the conviction of a township supervisor for

accepting bribes in exchange for payments out of township's general assistance program, even if

program itself did not receive more than $10,000 in federal funds) (citing *Salinas v. United

States*, 522 U.S. 52, 56-57 (1997)). Rather, the statutory language of § 666 requires proof only

that Genova and Gulotta were agents of Calumet City when it received in excess of $10,000 in

federal funds in 1996 and 1997; "the language neither explicitly nor implicitly requires that the

$10,000 be directly linked to the program that was the subject of the bribe." *United States v.

Coyne*, 4 F.3d 100, 108-09 (2d Cir. 1993) (holding that § 666 applied to county executive's

conduct, even where none of the programs for which he was accused of receiving bribes was

supported by federal funds). *See also United States v. Bonito*, 57 F.3d 167, 172 (2d Cir. 1995)

(stating that "there are a number of factors in favor of construing § 666 to cover corruption of

agents of a federally funded organization even in those official activities that do not implicate

their organization's own funds"); *United States v. Westmoreland*, 841 F.2d 572, 577 (5th Cir.

1988) (concluding that "the legislative history [of § 666] manifests a congressional intent to

preserve the integrity of federal funds, [and] Congress specifically chose to do so by enacting a

criminal statute that would eliminate the need to trace the flow of federal monies"). As such, we may find Genova and Gulotta guilty of violating § 666, regardless of whether a direct loss resulting from their alleged attorney fees kickback scheme was actually incurred by Calumet City. Yet, this Court concludes that Calumet City did suffer a direct loss because it did not receive the type of attorney services it should have received.

In this case, it has been stipulated that Calumet City received federal funds in excess of $10,000 in both 1996 and 1997 – the years charged in Counts Five and Six of the indictment. (Stipulation No. 8.) We further find that Genova and Gulotta stole and "obtain[ed] by fraud" property owned by Calumet City and valued at $5,000 or more, in that Genova deceived Calumet City and its citizens by hiring Gulotta, a corrupt and conflicted counsel, in order to foster their illegal attorney fees kickback scheme. *See United States v. Ferrara,* 990 F. Supp. 146, 151 (E.D.N.Y. 1998).

The *Ferrara* Court rejected any need for the government to establish that the defendants' conduct actually "caused a loss" of $5,000 to a municipality to establish a violation of Section 666. The *Ferrara* Court found that such an approach "would virtually eviscerate Section 666"; the court contemplated the example of an attorney, hired to defend hundreds of thousands of dollars of tax certiorari suits filed against the town, who "received the nod over other applicants by bribing decision-making officials." *Id.* The court asked, "[i]f it could not be established that [the attorney's] selection – procured via bribes – had an adverse impact on the town's financial well-being, would the transaction be beyond the reach of Section 666?" *Id.* Similarly, we ask, "if it could not be established that Genova's corrupt selection of Gulotta, a conflicted counsel, to serve as the City Prosecutor of Calumet City had an adverse impact on the city's financial well-

being, would the transaction be beyond the reach of Section 666?"  Like the *Ferrara* Court, we

conclude that "Congress fashioned the statute to avoid [these] type of accounting quagmires... ."

*Id.  See also Westmoreland*, 841 F.2d at 578 ("it is sufficient that Congress seeks to preserve the

integrity of federal funds by assuring the integrity of the organizations or agencies that receive

them").  Our focus is on the individuals who controlled the dollars in the illegal attorney fees

kickback scheme, Genova and Gulotta, not on the financial well-being of Calumet City itself.

The defendants' corrupt scheme perpetrated a fraud upon Calumet City and its citizens in

violation of 18 U.S.C. § 666.  Simply put, the attorney fees kickback scheme constituted a theft

by deception because the citizens of Calumet City were deprived of conflict-free outside counsel.

We therefore find that the Government proved beyond a reasonable doubt that Genova and

Gulotta are guilty of Counts Five and Six of the Indictment.

## VIII. Ronald Kawanna's Trial Testimony Constituted Perjury

The Government's abundant direct and circumstantial evidence established beyond a

reasonable doubt that Ronald Kawanna's testimony – that he was unbiased and that Genova had

in fact done substantial legal work for the Law Firm – was willful and material to the prosecution

of this case and made with the specific intent to obstruct justice rather than as a result of Mr.

Kawanna's confusion, mistake or faulty memory.

Mr. Kawanna is an experienced attorney who knowingly gave false, material testimony to

this Court and the jury in a blatant effort to obtain acquittals for his friends and business

associates – Genova and Gulotta.  This testimony was pure and unadulterated perjury.  *See*

18 U.S.C. § 1623(a) (proscribing "knowingly mak[ing] any false material declaration" under oath

in a court proceeding); *United States v. Gellene*, 182 F.3d 578, 589-92 (7th Cir. 1999) (upholding

defendant's conviction for using a document, under oath, knowing that it contained a material falsehood, in violation of § 1623) (citing *United States v. Gaudin*, 515 U.S. 506, 509 (1995); *Kungys v. United States*, 485 U.S. 759, 770 (1988) (other citations omitted).

## CONCLUSION

The word "tragedy" has taken on new meaning since the events that occurred in this country on September 11, 2001. On August 27, 2001, after the jury verdict was returned, this Court entered an order which indicated that this opinion would be issued. That order noted that it was a sad day for the citizens of Calumet City. (8/27/01 Ct. Order.) The formal issuance of this opinion details that August 27, 2001 was also a sad day for the legal profession. As indicated in the often too little read preamble to the Illinois Rules of Professional Conduct "[t]he practice of law is a public trust." Preamble to the Illinois Rules of Professional Conduct, Article VIII. The practice of law is not a right. The practice of law is a hard-earned license to assist the public good while making a fine living under any set of standards. As detailed in this opinion, two members of the Illinois Bar, Jerome P. Genova and Lawrence P. Gulotta, violated that public trust by repeated violations of our criminal law.

Another member of our bar, Ronald Kawanna, stands accused by this Court of violating the public trust by committing perjury during the criminal trial of his law partner. This is an accusation that is not made lightly by this Court. Perjury has no place in our justice system. Our adversarial system is dependent on truthful testimony regardless of its difficulty or sensitivity. Without honest testimony our justice system loses one of the four pillars which holds up our justice system on a daily basis. The other three pillars – competent counsel, independent judges and jury trials – cannot effectively operate if witnesses freely give false, material testimony.

Rule of law – the bedrock of this country – cannot operate in a system which tolerates false testimony. Voluntary and intentional perjury by a licensed attorney is abhorrent. It means that the attorney believes that the justice system is just a game to be played at, rather than the guarantor of our rights as citizens of the finest democracy in the world. No Court should ever tolerate perjured testimony -- let alone perjured testimony by an officer of the Court.

In keeping with the Court's own professional and ethical responsibilities, the Court will transmit copies of this opinion to both the Attorney Registration and Disciplinary Commission and the Executive Committee of this Court[2] with the Court's recommendation that all three attorneys – Genova, Gulotta and Kawanna – be permanently disbarred.

For the reasons indicated herein, this Court finds, as indicated in our prior order, that the government's evidence overwhelmingly established the charged attorney fees kickback scheme beyond a reasonable doubt and that Gulotta has been proven guilty of all the crimes pending against him in the indictment. This Court hereby enters a judgment of guilty against Gulotta on Counts One, Two, Three, Four, Five and Six of the pending indictment.

**ENTERED:**

**Judge Ruben Castillo**
**United States District Court**

**Dated: October 22, 2001**

---

[2] Since I am presently serving as a member of this Court's Executive Committee, I will recuse myself of any participation in this disciplinary matter.